UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SHARON M. CAMP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:08CV0022 AGF |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This action is before this Court[1] for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Sharon M. Camp was not disabled and, thus, not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. For the reasons set forth below, the decision of the Commissioner shall be reversed and the case remanded for further development of the record.

Plaintiff, who was born on July 20, 1957, filed an application for disability benefits on March 1, 2006, at the age of 49, alleging a disability onset date (as amended) of January 20, 2006, due to lupus and degenerative back disease. After Plaintiff's application was denied at the initial administrative level, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") and such a hearing was held on June 26,

---

[1] The parties have consented to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

2007, at which time Plaintiff amended her disability onset date to February 28, 2006. By decision dated August 8, 2007, the ALJ found that Plaintiff was capable of performing past relevant work as a hospital admitting clerk and secretary. Plaintiff requested review by the Appeals Council of the Social Security Administration, submitting new medical evidence. The request for review was denied on December 8, 2007. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's findings were not supported by substantial evidence. Specifically, Plaintiff argues that the ALJ erred by relying only on the opinion of a nonmedical source (Victor Washburn) in assessing Plaintiff's residual functional capacity ("RFC") to perform work-related activities. Plaintiff additionally argues that the ALJ erred by failing to provide reasons for discrediting Plaintiff's testimony. Plaintiff requests that the ALJ's decision be reversed and that the case be remanded for the award of benefits or for further evaluation.

## BACKGROUND

### Work History and Application Forms

Plaintiff's application forms state that she worked full time from 1985 to 1992 as a pharmacy technician; from 1992 to 1994 as a secretary/receptionist in a doctor's office; from 1994 to April 2003 at a hospital in registration; from April 2003 to March 2004 as an OB technician at the same hospital; and from March 2004 to January 20, 2006, as a patient care technician/secretary at another hospital (4 full days a week). She described

2

her registration jobs as requiring her to walk for a total of two hours, stand for a total of two hours, sit for a total of three hours, do some kneeling each day, and lift up to 10 pounds frequently.  Her job as an OB technician involved walking for a total of three hours, standing for a total of two hours, and sitting for a total of one hour each day, with some stooping and crouching.  Plaintiff's description of the exertional requirements of her patient care technician/secretary job was similar.  (Tr. 75-85.)

**Medical Record**

An MRI dated March 29, 2005, revealed severe degenerative disc disease and moderate to severe spinal stenosis at C5-6.  Id. 184.  On April 14, 2005, Plaintiff underwent a cervical epidural steroid injection to treat cervical radiculitis, severe degenerative disc disease, and moderate to severe spinal stenosis at C5-6.  Id. 220-21.  Plaintiff went to the emergency room ("ER") on April 19, April 25, May 3, and May 19, 2005, complaining of neck and back pain.  Id. 189-209.  She underwent physical therapy from April 18 to May 2, 2005.  Id. 210-13.  On May 24, 2005, Plaintiff underwent an anterior cervical discectomy at C5-6; decompression of the thecal sac and the nerve roots bilaterally at C5-6; interbody fusion at C5-6; and anterior cervical plating at C5-6.  Id. 185-88.

On November 9 and December 29, 2005, Plaintiff went to the ER complaining of bilateral leg pain and was diagnosed both times with fibromyalgia exacerbation.  A radiograph of the lumbosacral spine revealed significant atherosclerotic change of the abdominal aorta.  It was noted that Plaintiff's leg pain could represent claudication.  Id.

3

122-28, 115-21. On February 28, 2006 (Plaintiff's amended onset date), Plaintiff went to the ER complaining of back and leg pain/swelling. Her diagnosis was systemic lupus erythematosus for which she was prescribed oxycodone. Id. 487-502.

In a report dated March 1, 2006, an interviewer for the Social Security Administration noted that Plaintiff had difficulty sitting, standing, and walking. The interviewer observed, "Claimant showed signs of physical limitations such as limping, walking slow, sitting to[o] long caused stiffness and standing was slow." Id. 71.

On April 11, 2006, state disability examiner Victor Washburn completed a Physical RFC Assessment form, upon review of Plaintiff's file. He indicated in checkbox format that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of six hours in an eight-hour workday, and sit for a total of six hours in an eight-hour workday. He further indicated that Plaintiff's ability to reach in all directions including overhead was limited, but that her ability to push and/or pull was unlimited and that she had no postural (e.g., climbing and stooping), communicative, or environmental limitations. Mr. Washburn indicated that there were no treating or examining source statements in the file regarding Plaintiff's physical capacities. Id. 227-34.

On April 12, 2006, Plaintiff went to the ER complaining of pain in her hips/legs. She was told that her exam indicated that she had myofascial pain syndrome which caused a wide variety of symptoms, including aching and numbness and most commonly affected the neck, upper back, and shoulder areas, with pain often radiating down into the

arms and hands. Her diagnoses were fibromyositis and lupus erythematosus, and she was prescribed hydrocodone. Id. 357-75.

On May 10, 2006, Micki Klearman, M.D., Plaintiff's rheumatologist, noted that Plaintiff suffered from lupus manifestations, including Raynaud's (a disorder characterized by episodic attacks that cause the blood vessels in the fingers or toes to constrict), hand swelling/pain, diffuse rashes, sun sensitivity, and nasal ulcers. The most recent and severe problem was noted as bilateral leg pain. Id. 388-95. An x-ray dated May 10, 2006, revealed multilevel degenerative disc disease of the lumbar spine and atherosclerosis of the aorta. Id. 396. An MRI of the lumbar spine dated May 11, 2006, revealed degenerative disc disease within the mid and lower lumbar spine, most severe at L4-5 where a small annular tear resulted in narrowing of the left neural foramen and possible compression of the left L4 nerve root within the neural foramen; anomalous configuration of the T-11, T12, and L1 spinous processes, possibly congenital or post-surgical in nature; and mild, diffuse disc bulges at L2-3, L3-4 and L4-5. Id. 397-98.

On June 4, 2006, Plaintiff again presented to the ER complaining of back and bilateral leg pain. Id. 344-56. On June 6, 2006, Dr. Klearman noted that Plaintiff had difficulty getting up on to the examining table, had marked spasm of the paraspinal muscles from the mid-thoracic area down to the sacrum, and had limitation of flexion and extension of the lumbar spine due to pain. Straight leg raising was positive on the right. Systemic lupus was not active. Id. 387.

On June 15, 2006, Rahul Rastogi, M.D., a physicain at a pain management center,

noted that Plaintiff's affect was flat, she had an antalgic gait (a limp adopted so as to avoid pain on weight-bearing structures, such as in hip, knee, or ankle injuries), her lumbar range of motion was restricted in almost all directions which exacerbated pain, she had positive straight-leg raise, extreme range of motion reproduced low back pain, slump test was positive, sacroiliac ("SI") joint provocation tests were significantly positive on the left side, and Plaintiff had tenderness over the lumbar paraspinous muscle group. Id. 399-405. On June 23, 2006, Plaintiff underwent a selective nerve root injection at bilateral L4-5 and L5-S1. Id. 452-53.

On July 11, 2006, clinical psychologist, Beverly Field, Ph.D., conducted a psychological evaluation upon referral by Dr. Rastogi. Dr. Field diagnosed possible depression and opined that Plaintiff was a good candidate for an eight-week multidisciplinary pain management program. Id. 248-50. Plaintiff underwent physical therapy from July 11 through September 20, 2006. Id. 259-76. On July 25, 2006, Plaintiff underwent a left sacroiliac joint injection, and on August 28, 2006, another epidural steroid injection at bilateral L4-5 and L5-S1. Id. 455-59.

Plaintiff attended the eight-week pain management program recommended by Dr. Field from August 2 to September 20, 2006. Id. 251-58. On August 30, 2006, Plaintiff went to the ER for low back pain and numbness in both legs. Id. 322-41. An MRI dated August 30, 2006, revealed a three to four mm epidural hematoma at L3-4; degenerative disc disease within the mid and lower lumbar spine most severe at L4-5. where a small annular tear resulted in narrowing of the left neural foramen and possible compression of

the left L4 nerve root; anomalous configuration of the T-11, T-12, and L1 spinous processes, possibly congenital or post-surgical in nature; and mild, diffuse disc bulges at L2-3, L3-4, and L4-5. Id. 342-43. On November 29, 2006, Plaintiff went to the ER complaining of back pain. Her diagnosis was acute flare up of chronic back pain. Id. 292-305.

On January 5, 2007, neurosurgeon Todd J. Stewart, M.D, examined Plaintiff upon referral by Dr. Rostogi. Dr. Stewart reported that Plaintiff had decreased range of motion of her hips, knees and lumbar spine; diffuse 4+/5 bilateral weakness in the lower extremities secondary to pain; difficulty getting from a seated to a standing position; a very antalgic gait; severe low back pain with straight leg raise to 45 degrees; and pain with reverse straight leg raise bilaterally in her central low back and in her sacroiliac joints. He wrote that Plaintiff was in obvious pain and distress throughout the physical examination. Dr. Stewart also wrote that he did not believe that Plaintiff would benefit from back surgery, and that Plaintiff and her husband were very disappointed to hear this. Id. 377-88.

On January 19, 2007, Plaintiff went to the ER complaining of back pain and bilateral leg pain. Id. 277-91. On February 6, 2007, Dr. Rastogi diagnosed lumbosacral degenerative joint disease and disc disease; chronic low back pain; bilateral lower extremity radicular pain; and MRI consistent with multilevel degenerative disc disease with severe stenosis and degeneration at L4-5. Dr. Rastogi wrote, that in light of the failure of conservative pain management and Plaintiff not being a surgical candidate, he

would request approval from her insurance company for a dorsal column stimulator trial. Id. 440.

On March 22, 2007, rheumatologist Micki Klearman, M.D., noted that Plaintiff has relatively mild systemic lupus, which was not likely related to her back symptoms. Id. 379. An MRI dated May 29, 2007, revealed mild multilevel degenerative changes of the lumbar spine; mild disc bulge at L4-5 with disc abutting the traversing L5 nerve roots and narrowing of the bilateral lateral recesses; and an annular tear at L4-5 and L5-S1. Id. 472-73.

**Evidentiary Hearing of June 26, 2007 (Tr. 519-36)**

Plaintiff, who was represented by counsel, testified that she was 49 years old, had a GED, and had completed a paramedic class. Plaintiff described her past work, stating that she left her last job as a patient care technician at the end of January because her husband obtained a job in another area and they relocated. Plaintiff testified that she sought employment after the move for about one month before she started feeling bad.

Plaintiff testified that she had gone back to work after her cervical fusion, and also after bowel surgery in July 2005. Plaintiff testified that she began having back pain around November 2005, but that she had been feeling leg pain before that, which started getting more severe by December 2005. She said that she did not seek treatment for her ailments until June 2006. Plaintiff confirmed that Dr. Stewart indicated that he did not believe she was a candidate for surgery. Her treatments consisted of steroid shots, a block injection, physical therapy and psychological therapy too. She currently was not

8

experiencing problems with her neck, but was experiencing severe stabbing pain in her back radiating to her legs and feet. She also still had pain in her hips and knees. Plaintiff told the ALJ that the only problem that prevented her from working full time was her pain.

She testified further that her insurance company denied the request for a nerve stimulator, and that she got only minimal relief from the series of injections she was given. She testified that on a really bad day, her pain was a ten (on a scale of zero to ten), on most days it was a 9, and on good days it was a 7 or 8. Activity such as walking, bending, or sitting too long made the pain worse, and a heating pad, ice packs, and lying down helped ease the pain. Plaintiff testified that she often used a cane if she went outside the house. She could walk about one block, stand for about five minutes, and on a good day sit for about one-half hour, before she had to change her position.

Plaintiff testified that she had about three good days a week. She could do hardly any lifting without experiencing pain in her back. Plaintiff's husband did the housework and the shopping, with Plaintiff helping with some chores, like loading the dishwasher, that she could do slowly. On a typical day, Plaintiff would get up at about 8:30 a.m. and go to sleep at about 10:00 p.m. She would eat breakfast, take her medications, watch TV, do some exercises, read a book for as long as she could sit, walk the hallways of the house, and lie down for several hours. Plaintiff testified that her lupus was under control.

The ALJ then asked a vocational expert ("VE") to consider an individual with Plaintiff's vocational factors (age, education, and work experience) who could lift and

9

carry up to 20 pounds occasionally, and ten pounds frequently, stand or walk for six hours out of eight, sit for six hours out of eight, occasionally climb stairs and ramps, but never ropes, ladders, and scaffolds, and should avoid repetitive reaching overhead bilaterally and concentrated exposure to hazards and unprotected heights.[2]  The ALJ asked the VE if such an individual could perform any of Plaintiff's past jobs, and the VE responded that such an individual could do Plaintiff's past jobs as an admitting clerk and secretary.  If the individual could only lift ten pounds occasionally and less than ten pounds frequently, the individual could still be an admitting clerk.  In response to a question by Plaintiff's counsel, the VE testified that if the individual had to rest during the day with the frequency testified to by Plaintiff and experienced pain on the scale of seven to ten, the individual would not be able to hold any job on a regular basis.

**ALJ's Decision of August 8, 2007 (Tr. at 16-23)**

The ALJ determined that Plaintiff's degenerative disc disease with radiculopathy was a "severe" impairment as that term is defined by the Commissioner's regulations, but that her history of surgical fusion, knee pain, lupus, and alleged depression were non-severe impairments.  The ALJ next concluded that the degenerative disc disease did not meet the requirements for a deemed-disabling impairment listed in the Commissioner's

---

[2] These abilities and limitations are similar, but not identical, to those indicated by Mr. Washburn on the Physical RFC Assessment form he completed on April 11, 2006. Tr. at 227-34.  For example, as noted earlier in the Background section, Mr. Washburn did not indicate that Plaintiff could only occasionally climb stairs and could never climb ladders.

regulations. In reaching this conclusion, the ALJ stated that Plaintiff's objectively documented moderate narrowing at the L5-S1 disc level did not evidence any nerve root narrowing or spinal arachnoiditis, and had not been diagnosed as spinal stenosis, as required for the relevant listings.

The ALJ proceeded to consider whether Plaintiff had the RFC to perform her past work or other work and set forth the factors relevant to this inquiry and to assessing Plaintiff's credibility. The ALJ found that Plaintiff had the RFC to perform light work except for no bilateral reaching overhead; no repetitive pushing and pulling with the lower extremities; no climbing of ropes, ladders, or scaffolds; and no more than frequent climbing of stairs or ramps. The ALJ found that although Plaintiff's objectively documented impairments could reasonably be expected to cause some pain limitations, Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not "entirely credible," and the medical record as a whole did not support finding that Plaintiff experienced such debilitating pain as to prevent her from performing work duties within the assessed RFC. The ALJ supported this finding by stating that there was no documented long-term and significant muscle atrophy or loss of muscle tone. In addition the ALJ relied upon the fact that, although Plaintiff testified that she used a cane to ambulate outside her home, there was no medical evidence that Plaintiff was prescribed the prolonged use of a cane.

The ALJ also pointed to the facts that no treating physician found or imposed significant functional limitations or recommended that Plaintiff stop working, that

11

Plaintiff did not require surgery or prolonged hospitalization since the alleged disability onset date, and that the record did not reflect that Plaintiff's work deteriorated or that she was fired due to impairment-related symptoms. Rather, according to the ALJ, the record established that Plaintiff stopped working only because she and her husband relocated. The ALJ noted the evidence that after the relocation, Plaintiff looked for work. He found that this fact "severely diminishe[d] her credibility," because it was inconsistent with her allegation that she was disabled since January 2006.

The ALJ next determined that Plaintiff's assessed RFC was not inconsistent with the ability to perform Plaintiff's past work as a hospital admitting clerk and secretary, considering the demands of these past jobs as described by Plaintiff in her application forms. The ALJ also credited the VE's testimony that an individual with Plaintiff's vocational factors (age, education, and work experience) and assessed RFC could perform Plaintiff's past work. Accordingly, the ALJ found that Plaintiff was not disabled.

**New Evidence Submitted to the Appeals Council**

Medical records submitted to the Appeals Council show that on August 15, 2007, Plaintiff went to Gateway Spine, LLC, seeking help upon referral by a friend. Plaintiff's chief complaints were lower back pain, bilateral buttock discomfort, bilateral thigh pain traveling to her knees, and bilateral ankle pain. Her current medications included plaqunil for lupus, Vicodin five times a day, xanaflex three times a day, Valium at night, and a lipoderm patch. Physical examination revealed an abnormal gait -- it was noted

12

that Plaintiff had a cane with her -- diffuse tenderness to palpation in her lumbar spine, significantly diminished range of motion of her back due to pain, straight leg raise while seated was negative. The report noted that Plaintiff's x-rays from February 2007 suggested "some mild space narrowing at L4/5," that MRI findings from May 2007 and August 2006 were minimal and showed that Plaintiff had "some mild discogenic changes, but really nothing too bad." Id. 508-09.

A CT of the lumbar spine dated August 20, 2007, revealed abnormal disc morphology from L3 through S1, with the most symptomatic level at L4-5. Id. 513-14. On August 22, 2007, Plaintiff was again told that surgery was not likely to help her (because her recent discogram was positive at all levels). Id. 505.

## DISCUSSION

**Standard of Review and Statutory Framework**

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)).

13

Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. If the impairment or combination of impairments is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the deemed-disabling impairments listed in Appendix I. If not, the Commissioner asks at step four whether the

claimant has the RFC to perform her past relevant work as she actually performed it, or as generally required by employers in the national economy. If so, the claimant is not disabled. If she cannot perform her past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform work that is available in the national economy and that is consistent with the claimant's vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (very heavy, heavy, medium, light, sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Commissioner's Medical-Vocational Guidelines, which are fact-based generalizations about the availability of jobs for people of varying vocational factors and exertional impairment. Where a claimant cannot perform the full range of work in a particular category due to nonexertional impairments such as pain, the Commissioner must consider testimony of a VE as to whether there are jobs that a person with the claimant's profile could perform.

**ALJ's Assessment of Plaintiff's RFC**

Plaintiff argues that in formulating Plaintiff's RFC and the ALJ's hypothetical question to the VE, the ALJ committed reversible error by relying on Mr. Washburn's physical RFC assessment. Plaintiff argues further that the ALJ improperly engaged in medical conjecture by assuming that disabling pain would be evidenced by some significant muscle atrophy or loss of muscle tone, and that the ALJ incorrectly stated that there was no evidence of nerve root compression, as the December 19, 2006 MRI

15

revealed such compression.

A disability claimant's RFC reflects what she can still do despite her limitations. 20 C.F.R. § 404.1545(a). The "'most important issue'" in a disability determination is whether the claimant has the RFC "to do the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Forehand v. Barnhart, 364 F.3d 984, 988 (8th Cir. 2004) (citation omitted). The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, "the ALJ bears the primary responsibility for determining a claimant's" RFC. Id. at 1023. While an RFC is based on all relevant evidence, it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC], and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Id. (quoting Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001)). The ALJ is therefore required to consider at least some supporting evidence from a medical professional. Id.; Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Here, the only assessment in the record before the ALJ regarding Plaintiff's

functional abilities is the April 11, 2006 RFC assessment of Mr. Washburn, a nonmedical source. While the Eighth Circuit has held that the opinion of a non-treating, non-examining physician (or other medical source) can satisfy this requirement, see, e.g., Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004); Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005), the Commissioner has not cited, nor has this Court found, any cases standing for the proposition that an ALJ may rely on the opinion of a nonmedical source. And the Court cannot say with any degree of certainty that the error was harmless, as there was no other medical opinion evidence with regard to Plaintiff's functional abilities. Further, as Plaintiff argues, the ALJ's statement regarding pain and muscle atrophy or loss of tone is a medical determination, not in the province of an ALJ. See Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000) ("An administrative law judge may not draw upon his own inferences from medical reports.").

Although the ALJ gave some valid reasons for not crediting the full extent of Plaintiff's allegations, the Court believes that the better course here is to reverse the ALJ's decision and remand the case for an assessment of Plaintiff's physical RFC by a medical source, and for reconsideration of Plaintiff's application for benefits with that assessment as evidence. See Dewey v. Astrue, 509 F.3d 447, 450 (8th Cir. 2007) (reversing and remanding adverse disability determination where ALJ relied on a nonmedical source's RFC assessment and the Court could not say that the ALJ would inevitably have reached the same result if he had understood that the RFC assessment had not been completed by a medical source); McGowan v. Astrue, No. 4:06CV01573 ERW,

17

2008 WL 495629, at *3 (E.D. Mo. Feb. 20, 2008) (same).

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** for further development of the record and reconsideration of Plaintiff's application.

A separate Judgment shall accompany this Memorandum and Order.

*Audrey G. Fleissig*
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 13th day of March, 2009.